

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00458-CV

**IN THE INTEREST OF C.J.P.**, L.B.P., and J.J.P., Children

From the 365th Judicial District Court, Zavala County, Texas
Trial Court No. 22-10-15029-AJA
Honorable Amado J. Abascal III, Judge Presiding

Opinion by:     Luz Elena D. Chapa, Justice

Sitting:        Luz Elena D. Chapa, Justice
                Beth Watkins, Justice
                Lori Massey Brissette, Justice

Delivered and Filed: December 23, 2024

AFFIRMED

Appellant J.F. appeals the trial court's order terminating her parental rights to C.J.P.,

L.B.P., and J.J.P.[1] She challenges the sufficiency of the evidence to support the trial court's

grounds for termination and the best-interest finding, and she separately challenges the trial court's

conservatorship finding. We affirm.

### BACKGROUND

On October 27, 2022, the Department of Family and Protective Services filed an original

petition seeking appointment as the children's temporary managing conservator and termination

---

[1] To protect the identity of the minor children, we refer to appellant and her children by their initials. *See* TEX. FAM.
CODE § 109.002(d); TEX. R. APP. P. 9.8.

of J.F.'s parental rights.[2] The case proceeded to a two-day bench trial on May 1 and May 29, 2024, consisting of testimony from seven witnesses and eighteen exhibits. After hearing the evidence, the trial court found the Department established by clear and convincing evidence the grounds for termination of J.F.'s parental rights as to the children pursuant to subsections (D), (E), (N), and (O). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), and (O). It further found by clear and convincing evidence terminating J.F.'s parental rights is in the children's best interest.[3] *See id.* § 161.001(b)(2). Based on its findings, the trial court appointed the Department the children's permanent managing conservator.

J.F. timely appealed the trial court's order. On appeal, J.F. challenges the trial court's termination on all grounds, the best-interest finding, and the conservatorship finding.

## STANDARD OF REVIEW

A parent-child relationship may be terminated, pursuant to Texas Family Code section 161.001, only if the trial court finds by clear and convincing evidence one predicate ground enumerated in subsection (b)(1) and termination is in a child's best interest. TEX. FAM. CODE § 161.001(b)(1)–(2); *see, e.g., In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024). Clear and convincing evidence requires proof that will produce in the factfinder's mind "a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. To determine if this heightened burden of proof is met, we employ a heightened standard of review by judging whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This heightened standard "guards

---

[2] At the time of the original petition, L.B.P., Jr. was sixteen years old. However, L.B.P., Jr. turned eighteen before the trial and, at the time of trial, was no longer a subject of the suit.

[3] The Department also sought termination of the parental rights of the children's father. By the time of trial, the trial court had already issued an interlocutory decree terminating the rights of the children's father who voluntarily relinquished his rights; the interlocutory decree became final with the final order of termination. The children's father is not a party to this appeal.

the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). Under this standard, the factfinder is the sole judge of evidentiary weight and credibility, including witness testimony. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). We do not reweigh witness credibility issues, and we "defer to the [factfinder's] determinations, at least so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)) (internal quotation marks omitted).

"When reviewing the sufficiency of the evidence, we apply the well-established [legal and factual sufficiency] standards." *In re J.M.G.*, 608 S.W.3d 51, 53 (Tex. App.—San Antonio 2020, pet. denied) (alteration in original) (quoting *In re B.T.K.*, No. 04-19-00587-CV, 2020 WL 908022, at *2 (Tex. App.—San Antonio Feb. 26, 2020, no pet.) (mem. op.)) (internal quotation marks omitted). "When reviewing whether the evidence is legally sufficient to support termination of parental rights, we 'view the facts in a light favorable to the findings of the trial judge, who heard the testimony, evaluated its credibility,' and dealt the closest with the evidence at hand." *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024) (quoting *In re J.F.-G.*, 627 S.W.3d 304, 315 (Tex. 2021)). "An appellate court 'cannot substitute [its] judgment for the factfinder's' when considering the credibility of the evidence presented." *Id.* (alteration in original) (quoting *J.F.-G.*, 627 S.W.3d at 316). "[T]he appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *Id.* (alteration in original) (quoting *C.H.*, 89 S.W.3d at 25) (internal quotation marks omitted). We must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we do not disregard undisputed evidence even if it does not

support the trial court's finding. *J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "Courts 'should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.'" *C.E.*, 687 S.W.3d at 308 (quoting *J.F.C.*, 96 S.W.3d at 266). In our factual sufficiency review, we consider the entire record and determine whether, in light of the entire record, any disputed evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" on the challenged finding. *J.F.C.*, 96 S.W.3d at 266.

### LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE TRIAL COURT'S TERMINATION ON SUBSECTION (D) AND (E) GROUNDS

J.F.'s parental rights were terminated pursuant to multiple predicate grounds, specifically (D), (E), (N), and (O). If, as here, the trial court terminates the parent-child relationship on multiple grounds under section 161.001(b)(1), we may affirm on any one ground because only one predicate violation under section 161.001(b)(1) is necessary to support a termination order. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re F.B.C.L.*, No. 04-20-00477-CV, 2021 WL 1649221, at *1 (Tex. App.—San Antonio Apr. 28, 2021, no pet.) (mem. op.) ("Only one termination ground—in addition to a best interest finding—is necessary to affirm a termination judgment on appeal.").

However, we must still consider J.F.'s issues relating to the sufficiency of the evidence to support the trial court's findings under subsections (D) and (E) because termination under subsections (D) and (E) may serve as the basis for a future termination of parental rights proceeding. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019); *see also In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022) ("[W]e may not bypass Father's evidentiary challenges to Subsections (D) and (E), the so-called endangerment grounds. Those grounds bear special significance because termination of a parent's rights under either can serve as a ground for termination of his rights to *another* child.").

## B. Termination Pursuant to Subsection (D)

To terminate parental rights pursuant to subsection (D), the Department must prove by clear and convincing evidence the parent knowingly placed the child in or allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(D); *In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *3 (Tex. App.—San Antonio May 13, 2020, pet. denied) (mem. op.). "Conditions or surroundings" establishing endangerment include "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis." *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). "Endanger," as used in subsection (D), means to expose to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (construing predecessor statute). An environment that endangers the child may be created by the physical living conditions in the child's home or by the conduct of a parent living in the home. *In re R.S.-T.*, 522 S.W.3d 92, 108–09 (Tex. App.—San Antonio 2017, no pet.). A parent knowingly places or allows a child to remain in an endangering environment when the parent is aware of the potential danger but disregards it. *M.R.J.M.*, 280 S.W.3d at 502. A child may therefore be endangered when the home environment creates a potential for emotional or physical injury; the injurious conduct does not need to be directed at the child, and the child does not need to suffer injury for the requirements of subsection (D) to be met. *Boyd*, 727 S.W.2d at 533; *I.N.D.*, 2020 WL 2441375, at *3. "For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "Parental and caregiver

illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *Id.*

"The relevant period for review of conduct and environment supporting termination under statutory ground D is before the Department removes the child." *R.S.-T.*, 522 S.W.3d at 109 (citing *J.O.A.*, 283 S.W.3d at 345); *see J.W.*, 645 S.W.3d at 749. Subsection (D) permits termination based upon only a single act or omission. *R.S.-T.*, 522 S.W.3d at 109.

**C. Termination Pursuant to Subsection (E)**

Under subsection (E), "endangerment" has the same definition as in subsection (D), "but the grounds of subsections (D) and (E) are otherwise different." *See In re J.K.N.G.*, No. 04-21-00310-CV, 2022 WL 689095, at *5 (Tex. App.—San Antonio Mar. 9, 2022, pet. denied) (mem. op.). To terminate parental rights pursuant to subsection (E), the Department must prove by clear and convincing evidence the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct" that endangered the child's "physical or emotional well-being." TEX. FAM. CODE § 161.001(b)(1)(E). Under subsection (E), the trial court must determine "whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being." *In re C.J.G.*, No. 04-19-00237-CV, 2019 WL 5580253, at *2 (Tex. App.—San Antonio Oct. 30, 2019, no pet.) (mem. op.). Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). The course of conduct may include a parent's actions and failures to act. *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied). "Scienter is not required for a parent's own acts or omissions"; proof of the parent's knowledge is required only when the allegation is the parent placed the child with others who endangered the child. *In re*

*K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *4 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.).

The Department does not have to prove the parent directed the endangering conduct at the child, did the conduct in the presence of the child, or caused an actual injury or threat of injury to the child. *Boyd*, 727 S.W.2d at 533; *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *M.J.M.L.*, 31 S.W.3d at 350. The danger to the child's well-being may be inferred from the nature of the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533. Thus, in considering whether a course of conduct endangering the child's physical or emotional well-being has been established, the trial court may consider evidence of the parent's conduct both before and after the child's birth, including conduct occurring after the child was removed from the parent's care. *K.J.G.*, 2019 WL 3937278, at *4; *Walker*, 312 S.W.3d at 617.

### D. The Evidence at Trial Addressing Subsections (D) and (E)

J.F. argues there is legally and factually insufficient evidence to support termination of her parental rights under either subsection (D) or (E). First, she contends the evidence is insufficient to establish (D) and (E) because (1) she was proactive in her conduct, removing herself from the environment with the father, who was the primary source of domestic violence; (2) she attended some counseling for domestic violence and has continued to stay away; and (3) she engaged in efforts to address her substance use disorder by successfully finishing inpatient drug treatment and participated in various rehabilitation programs.

As to subsection (E), she also argues the medical concerns regarding L.B.P.'s heel wound fail to meet subsection (E) because the Department did not show the child's heel wound infection was caused by any neglect or direct action on J.F.'s part, and medical professionals did not definitively attribute the infection to her neglect of L.B.P. or due to antibiotic-resistant bacteria.

She further argues there was no evidence to show J.F. deliberately neglected her children's medical needs or knowingly endangered the child's physical health. She further argues the evidence demonstrated J.F. took care of L.B.P. at home and at school, changed her catheter, and brought her diapers and whatever the child needed. Finally, she argues the children were not subject to willful neglect; instead, their endangerment was a "byproduct of difficult circumstances," exemplified by damage to the home, including broken windows and exposed wires, which J.F. worked to repair. She further argues the Department's evidence of unsanitary conditions, like mold in the bathroom and expired food in the kitchen, do not necessarily rise to endangerment, and in fact, when L.B.P. returned to the family home after her hospital stay, the evidence shows she did not suffer or get hurt.

The evidence at trial supporting endangerment addressed J.F.'s history of involvement with the Department, J.F.'s criminal and incarceration history, J.F.'s substance use disorder, L.B.P.'s heel wound requiring hospitalization, the domestic violence between J.F. and the children's father, and the extraordinary state of disrepair of the children's home. Sonia Diaz, a permanency specialist for BELONG acting as the Department caseworker from March 2024 through trial, testified the Department had a lengthy history with J.F. going back to 2005 when J.F. gave birth to a child who tested positive for drugs, and there was reason to believe J.F. had a substance use disorder.

Marc Martinez testified he was J.F.'s probation officer from approximately May 2017 through October 2023 during the time he worked for the Zavala County Probation Office. Martinez testified J.F. had two convictions for burglary of a habitation and was placed on probation for seven years. Martinez testified J.F. had active warrants for her arrest in connection with her probation cases and was presently considered an absconder.[4] He testified they last spoke on April

---

[4] The warrants were issued within a month of May 1, 2024 when Martinez testified.

13, 2023, when he reminded her to report, but she failed to report. Martinez stated he was not certain she was aware of the warrants, but he was certain she knew she had a court date the week after the May 1, 2024 trial date in the present case. He was unaware of her whereabouts and testified she would be incarcerated if found.

On the second day of trial—occurring four weeks later on May 29, 2024—J.F. testified she was arrested a few days earlier and was incarcerated in the Zavala County Jail for a parole violation, specifically, failing to pay her fines. She further testified the burglary in question was for theft of a bag of molded cheese, half a bag of peppers, and chocolate candy from a person she still considers a friend. She further testified she did not report to her probation officer because she misunderstood when her parole was supposed to end, believing it had already ended.

Turning to J.F.'s substance use disorder, Martinez also testified J.F. was required to drug test during her probation, and she had one no-show for testing, one failure to submit a urine sample during another test, one positive urinalysis for amphetamines and opiates, and two negative urinalyses. However, J.F. had no positive tests after 2020. Martinez further testified another condition of J.F.'s probation was she enter an inpatient drug treatment facility, and she did do so, completing the program in November 2020 at the 38th Judicial District Community Corrections Facility.[5] Martinez conducted no field visits after 2020 and therefore had no later knowledge of the conditions of J.F.'s home.

Ruth Sanchez Torres, a Department family-based specialist, testified she was briefly involved with the family while they attempted to perform services, and the children remained in their custody. J.F. told Sanchez Torres she had a substance use disorder involving methamphetamines; however, Sanchez Torres conceded she did not personally observe J.F.

---

[5] J.F. confirmed this testimony, explaining she was addicted to Vicodin at the time.

impaired or high; she only had heard it from J.F. and the children's father. J.F. also told Sanchez Torres she could not dissuade the children's father from using drugs, and she wanted to make things better for her children by checking into the inpatient rehabilitation center in Corpus Christi. Sanchez Torres testified J.F.'s plans were to take her older children with her and leave the younger two, including L.B.P., with their paternal grandmother. Sanchez Torres testified everything was set up for J.F. to enter the rehabilitation center, but when the Department arrived at her home to take her on October 25, 2022, she refused to go. Sanchez Torres testified the Department ultimately decided to remove the children after J.F. chose not to go to the center and did not follow through with other services.[6]

Leonardo Esquivel, the Department's caseworker for the children from the beginning of the case through March 2024, testified J.F.'s substance use disorder was a concern; J.F. denied using substances, and the children's father informed him J.F. had used substances with him the previous day. Esquivel further testified he believed the children's father that J.F. had used substances with him because the children's father and J.F. were living together at that time. Esquivel further testified J.F. never completed a drug test after the children were removed despite Esquivel's offer of transportation; "she would always come up with a different excuse."[7] On cross-examination, Esquivel conceded he never observed the odor of drugs on J.F.

J.F. testified the children were removed because the children's father was addicted to methamphetamines and was abusing her, then she occasionally relapsed and later everything in their home began to fall into a state of disrepair. J.F. confirmed she did not go to the inpatient

---

[6] Diaz testified similarly, adding the children were also removed because of the domestic violence, and the failure to properly care for L.B.P.'s heel wound.

[7] Esquivel attempted to learn the results of J.F.'s drug tests from probation officer Martinez, but Martinez never responded to Esquivel's inquiries.

rehabilitation center, but she denied not taking drug tests. She testified she took drug tests with her parole officer. She also testified she took a drug test prior to the children's removal, and it came back negative. She conceded she did not take a drug test after the children were removed because "everything was just about a drug test." However, she understood not taking drug tests after the children were removed would show a lack of cooperation with the Department's efforts to return her children to her.

Turning to L.B.P.'s heel wound, J.F.'s daughter L.B.P., who was approximately eight years old at the time, developed osteomyelitis while in J.F.'s care. Regina Sendejo, a school nurse for Crystal City Independent School District, testified that in September 2022 she noticed an ulcer developing on L.B.P.'s left heel. She testified the ulcer made it difficult for L.B.P. to walk. She contacted J.F. and left messages, expressing her concern. She received responses from J.F. "at times," but it was not clear whether the heel wound was being treated. She further testified it was hard to get in contact with J.F. The heel wound eventually grew larger and began to develop a black discoloration around the edges. Eventually, L.B.P. came to the school with a cast, suggesting it had been treated, but later the wound appeared to worsen, and L.B.P. eventually became wheelchair-bound because she could not put weight on the foot. On cross-examination, Sendejo conceded she wrote "no infection" in her notes.

L.B.P. was hospitalized for the heel wound from approximately September 15, 2022 to approximately October 12, 2022. Christine Velasco, a social worker for the Children's Hospital of San Antonio, described the wound as "very severe and serious." Velasco testified that during L.B.P.'s hospitalization, the hospital's medical team contacted her out of concern for medical neglect because the wound was not properly cared for, resulting in the medical team needing to do a lot of wound care and treatment to prevent further infection. Sendejo testified the heel wound

eventually required surgery, and there was some discussion about the potential need for amputation, which did not occur after all.[8] Sanchez Torres testified on cross-examination L.B.P. did initially go home with J.F. after she was discharged from the hospital, and she remained there for approximately two weeks before the Department started the removal process and did not suffer any additional injuries. J.F. testified the heel wound was a recurring pressure sore, resulting from L.B.P. bearing more weight on one leg than the other. She testified the Department misrepresented the situation by making it seem like L.B.P. got an infection under her care and was "losing her life" because she was neglecting her. She further testified the pressure sores would recur even in the grandparents' care.

Turning to domestic abuse, Velasco testified when she first met with L.B.P. and J.F., J.F. disclosed L.B.P.'s father was physically and emotionally abusive, she did not feel safe at their home, and she never wanted to see L.B.P.'s father again.[9] However, Velasco testified she saw J.F. accompanied by the children's father only a few days later at L.B.P.'s bedside while she was hospitalized. Velasco testified J.F. was frequently on the phone with the children's father when she was at the hospital with L.B.P. While discussing her domestic abuse with Sanchez Torres, J.F. indicated she was both a victim and an aggressor during instances of domestic violence, and it usually involved use of illegal substances.[10] Esquivel testified the children were endangered by the domestic violence, they witnessed it, and they told him they did not want to go back to that environment.[11] He further testified J.F.'s services included family violence prevention services in Uvalde. Rather than complete those services or counseling to address the issue, she would reunite

---

[8] Esquivel testified similarly.

[9] J.F. made similar statements to Sanchez Torres.

[10] Esquivel testified similarly.

[11] Diaz testified similarly.

with the children's father and return to their home. She rejected Esquivel's offer of taking her to a shelter. Esquivel testified J.F. is not compliant because she failed to resolve or get help with the domestic violence.

Velasco conceded on cross-examination J.F.'s behavior of acting positively toward the children's father when he was present could simply have been another sign of the domestic abuse she suffered from the children's father, rather than her being on good terms with him.[12] On cross-examination, Sanchez Torres agreed J.F.'s concerns about the father's domestic violence showed J.F. was concerned for the well-being of her children.

J.F. testified the children's father was "beat[ing] [her] up," "and there was nothing much [she] could do about it." She added that after the beatings the children would console her. She further testified she regretted not leaving the children's father at the beginning of the domestic violence, rather than allowing them to see the abuse between the two. She further testified that since the children were removed, the children's father has repeatedly asked her to reunite with him, but she has not because of the abuse. And she thought she had proven to the Department she wanted to end the violence when she moved away to Asherton.

Turning to the condition of the home, Sanchez Torres testified she visited the home on October 24, 2022, before the children were removed by the Department, and she had concerns about the safety of the children in the home due to its condition and L.B.P.'s medical needs. Photographs taken by Sanchez Torres and admitted into evidence without objection showed unsafe and unsanitary conditions. They included, among other things, missing outlets, rodent feces, a bucket of water for flushing a toilet due to no running water, a living room cluttered with trash, a new box of cake mix rodents had chewed through within a day, air conditioning wires on the floor

---

[12] Esquivel testified similarly.

of a child's bedroom, a light fixture dangling from its wire, medications within reach of the children and sitting next to recently opened paint cans, weak wooden flooring, and a hole in the wall with exposed insulation, resulting from the children's father striking it during a domestic dispute.[13] Esquivel testified the parents informed him the home eventually lost electricity. J.F. told Sanchez Torres the conditions in the home were bad and the conditions that day were typical of the house's condition. Sanchez Torres testified the state of the home would make it difficult to maneuver a child's wheelchair.[14] Esquivel testified the children were endangered by the unlivable conditions of the home environment.

On cross-examination, Sanchez Torres agreed she saw food for the children in the home and agreed the clutter could be cleaned up. She also agreed floorboards were only weak in the living area and kitchen. J.F. testified the home fell into a state of disrepair because she and the children's father had been unable to maintain sobriety at various times. She further testified she tried to repair the home, but the children's father regularly sabotaged her progress.

### E. Analysis

Here, the trial court could have formed a firm belief or conviction J.F.'s actions endangered the children by knowingly placing them or allowing them to remain in conditions or surroundings endangering their physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D); *I.N.D.*, 2020 WL 2441375, at *3. Specifically, the trial court could have formed a firm belief or conviction the children were endangered in their home environment because J.F. engaged in domestic violence and the use of illegal substances in the home. *See J.T.G.*, 121 S.W.3d at 125 (providing abusive or violent conduct as well as illegal drug use by parent or other resident of

---

[13] Esquivel testified similarly and further testified the home actually got worse over time.

[14] Sendejo and Esquivel testified similarly.

child's home may produce environment endangering child's physical or emotional well-being); *In re O.E.R.*, 573 S.W.3d 896, 906 (Tex. App.—El Paso 2019, no pet.) (explaining parent demonstrated inability to protect children by continuing to engage in relationships with abusive partners). The trial court could have also formed a firm belief or conviction the children were endangered in the home because J.F. medically neglected L.B.P., resulting in L.B.P.'s hospitalization for osteomyelitis. *See, e.g.*, *In re J.A.J.*, No. 04-20-00156-CV, 2020 WL 4929797, at *3 (Tex. App.—San Antonio July 29, 2020, no pet.) (mem. op.) (concluding children's untreated, infected insect bites were evidence of medical neglect, which likewise endangered children's physical well-being); *In re A.A.H.*, Nos. 01-19-00612-CV, 01-19-00748-CV, 2020 WL 1056941, at *13 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.). (holding evidence legally and factually sufficient to support trial court's finding parent knowingly allowed child to remain in conditions endangering her physical or emotional well-being where evidence showed parent neglected medical needs of another child in home). Finally, the trial court could have concluded the conditions of the home—including the lack of running water, rodent feces, the ubiquitous presence of trash, and electrical hazards—was an endangering environment for the children. Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction termination of J.F.'s parental rights was valid under subsection (D) of section 161.001(b)(1). *See J.F.C.*, 96 S.W.3d at 266.

On this record, the trial court could also have formed a firm belief or conviction J.F. engaged in conduct or knowingly placed the children with persons who engaged in conduct endangering their physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E); *C.J.G.*, 2019 WL 5580253, at *2. Specifically, the trial court could also have formed a firm belief

or conviction J.F. engaged in a voluntary, deliberate, and conscious course of conduct endangering the physical or emotional well-being of the children when she was arrested and placed on probation for burglary of a habitation, was re-arrested for violating the terms of her probation, and remained incarcerated at the time of trial. *See, e.g.*, *In re J.B.*, No. 14-20-00766-CV, 2021 WL 1683942, at *5 (Tex. App.—Houston [14th Dist.] Apr. 29, 2021, pet. denied) (mem. op.) ("Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent may establish an endangering course of conduct."). The trial court could also have formed a firm belief or conviction J.F. engaged in a voluntary, deliberate, and conscious course of conduct endangering the physical or emotional well-being of the children when she allowed L.B.P.'s heel sore to worsen after repeated attempts by the school nurse to contact her, resulting in L.B.P.'s hospitalization for osteomyelitis. *See In re E.W.*, No. 14-19-00666-CV, 2020 WL 742327, at *8 (Tex. App.—Houston [14th Dist.] Feb. 13, 2020, pet. denied) (mem. op.) (concluding evidence supporting three-day lapse between time child broke leg and time parent ensured child was seen by doctor rose to level of medical neglect constituting endangerment conduct under subsection (E)); *In re J.D.G.*, 570 S.W.3d 839, 852 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (concluding failure to provide medical care for child may constitute endangering conduct under subsection (E) even if the parent did not cause need for medical treatment); *In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *14 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.) (concluding evidence demonstrated medical neglect by parent of one child supported finding of endangerment under subsection (E) as to another child); *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (concluding evidence as to how parent treated another child relevant regarding whether course of conduct under subsection (E) established). The trial court could also have formed a firm belief or conviction J.F. engaged in

a voluntary, deliberate, and conscious course of conduct endangering the physical or emotional well-being of the children when the evidence, including her own testimony, showed she dealt with substance use disorder for many years and, in spite of that, refused to check into an inpatient rehabilitation center and refused to drug test while working her family service plan. *See In re J.B.*, No. 14-20-00766-CV, 2021 WL 1683942, at \*5 (Tex. App.—Houston [14th Dist.] Apr. 29, 2021, pet. denied) (mem. op.) (providing drug abuse one form of criminal conduct that may jeopardize child's physical or emotional health and thus constitute endangering course of conduct under subsection (E)); *In re K.C.B.*, 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied) ("The trial court may infer from a refusal to take a drug test that appellant was using drugs."). Finally, the trial court could also have formed a firm belief or conviction J.F. engaged in a voluntary, deliberate, and conscious course of conduct endangering the physical or emotional well-being of the children when she and the children's father repeatedly committed acts of domestic violence in front of the children. *See, e.g.*, *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("Evidence of domestic violence may be considered as evidence of endangerment under subsection (E)."). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction termination of J.F.'s parental rights was valid under subsection (E) of section 161.001(b)(1). *See J.F.C.*, 96 S.W.3d at 266.

We therefore hold the evidence is both legally and factually sufficient to support the trial court's endangerment finding under subsections (D) and (E). *See* TEX. FAM. CODE

§ 161.001(b)(1)(D) & (E); *J.O.A.*, 283 S.W.3d at 346 (trial court is sole judge of weight and credibility of evidence, including testimony of Department's witnesses).[15]

**LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE TRIAL COURT'S BEST INTEREST FINDING**

J.F. argues the evidence is legally and factually insufficient to establish termination of her parental rights was in the children's best interest. Specifically, she contends (1) the children expressed a desire to maintain contact with her, (2) she showed a commitment to remain in their lives, (3) she made considerable strides in addressing the issues in her life; and (4) their best interest would not be served by continuing to have contact with their father because the children were in the care of his family.

### 1. Law

Under Texas law, "there is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, a trial court must also presume "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE § 263.307(a). In making a best-interest determination, the factfinder looks at the entire record and considers all relevant circumstances. *See C.H.*, 89 S.W.3d at 27–29.

In determining a child's best interest, a trial court should consider the factors set out in Texas Family Code section 263.307 and the non-exhaustive *Holley* factors.[16] *See Holley v. Adams*,

---

[15] Because legally and factually sufficient evidence supports the trial court's termination on (D) and (E) grounds, and a finding of only one ground for termination is necessary to support termination, we need not consider whether the evidence would support termination on subsections (N) and (O) grounds. *See A.V.*, 113 S.W.3d at 362; *see also* TEX. R. APP. P. 47.1.

[16] Section 263.307(b)'s factors include: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; whether the child has been the victim of repeated harm after intervention by the department; whether the child is fearful of returning to the child's home; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive

544 S.W.2d 367, 371–72 (Tex. 1976). Those factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) the present and future physical danger to the child; (4) the parental abilities of individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans held by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the parent's acts or omissions indicating the existing parent-child relationship is not proper; and (9) any parental excuse for the acts or omissions. *Id.* The Department does not have to prove every factor for a trial court to find termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27.

In our review of the trial court's best-interest findings, we must consider "the totality of the circumstances in light of the *Holley* factors" to determine whether sufficient evidence supports the challenged finding. *In re B.F.*, No. 02-07-334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.). Additionally, "[a] trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

### 2. Analysis

#### a. The Physical and Emotional Danger to the Children

J.F. argues she demonstrated she was acting in the children's best interest by leaving and staying away from her abuser, the children's father. "The evidence supporting the statutory

---

conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills; and whether an adequate social support system consisting of an extended family and friends is available to the child. *See* TEX. FAM. CODE § 263.307(b).

grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship." *In re S.M.G.*, No. 01-17-00056-CV, 2017 WL 2806332, at *6 (Tex. App.—Houston [1st Dist.] June 29, 2017, pet. denied) (mem. op.). Moreover, "[d]omestic violence may be considered in analyzing the best interest of the child." *In re N.M.R.*, No. 04-22-00032-CV, 2022 WL 3640223, at *7 (Tex. App.—San Antonio Aug. 24, 2022, pet. denied) (mem op.); *see, e.g.*, *In re K.V.C.*, No. 04-22-00150-CV, 2022 WL 3639511, at *5–6 (Tex. App.—San Antonio Aug. 24, 2022, pet. denied) (mem. op.) (providing evidence showing parents were unable to break cycle of domestic violence supported best interest finding); *see also* TEX. FAM. CODE § 263.307(b)(7); *Holley*, 544 S.W.2d at 371–72. The evidence, including J.F.'s own statements, shows J.F. was both subject to and the perpetrator of domestic violence in front of the children. The evidence shows J.F. did remove herself from the home, but she was also seen accompanying the children's father at other times, and she admitted to maintaining contact with the children's father and would continue to do so, even if it meant additional abuse because it was the only way to stay in her children's lives.

"Evidence of a parent's unstable lifestyle, including habitual drug and alcohol use, can support the conclusion that termination is in the child's best interest." *In re F.M.*, No. 14-18-00384-CV, 2018 WL 4925127, at *7 (Tex. App.—Houston [14th Dist.] Oct. 11, 2018, pet. denied) (mem. op.); *see* TEX. FAM. CODE § 263.307(b)(8) (providing as one factor whether there is history of substance abuse by child's family or others who have access to child's home). The Department also produced evidence it was concerned about J.F.'s substance use disorder, including J.F.'s failure to attend an inpatient rehabilitation center, her failure to submit to drug tests after her family service plan was in place, the children's father's own admissions about his and J.F.'s substance use disorder, and J.F.'s urinalyses with the Zavala County Parole Office.

### b. The Desires of the Children

At the time of trial, C.J.P. was sixteen years old, L.B.P. was ten years old, and J.J.P. was nine years old. The children were placed with family members from their father's side. Esquivel testified no one from J.F.'s family contacted him about placement, and J.F. did not provide any suitable family members.[17] At the time of trial, C.J.P. had been placed with a paternal uncle, L.B.P. placed with her paternal grandparents, and J.J.P. with a paternal aunt. The children visited with each other at their paternal grandparents' home. Esquivel testified the children love J.F., but they also voiced their desire to stay with their current caregivers. The Department produced testimony C.J.P. is "doing well," is "extremely happy" in his uncle's home and in school, is active in sports, and wants to attend college. J.J.P. is "doing very well" in his paternal aunt's home, living with his cousins.

Esquivel testified L.B.P. "has come a long way" from being wheelchair-bound, she is happy, and she likes to dance and run.[18] The grandparents love and spoil her, and she is "extremely attached" to them. They have been very active in taking her to medical appointments, and the paternal aunt and uncle—where the other children have been placed—have been supportive of the grandparents as well.[19]

C.J.P. knew the Department intended to seek termination of J.F.'s parental rights and believed it was in the best interest of himself and his younger siblings. All of the children are happy where they are, they do not want to go back to J.F., and they feel they are in a better place where their emotional and physical needs are being met. Each of the current caregivers were working to secure a license for adoption of the children, and C.J.P. has indicated he would like his paternal

---

[17] J.F. testified she did not have much family in Crystal City.

[18] Diaz testified similarly.

[19] Sendejo testified similarly.

uncle to adopt him.[20] Esquivel testified he believed the adoptions were in the best interest of the children. He further testified J.F. was not able to provide for the children at this point, and he believed it was in the children's best interest J.F.'s parental rights be terminated.

Diaz testified during her two months assigned to the family, she had a colleague visit the children on her behalf. Her colleague testified all of the children's needs were being met, they were very happy, the Department recommended the children remain in their current placements, J.F.'s parental rights be terminated, and the adoption of the children by their current caregivers would be in the children's best interest.

Turning to J.F.'s visitation, Velasco testified that prior to the removal of the children, J.F. frequently visited L.B.P. while she was hospitalized for osteomyelitis and would stay overnight with her. She testified L.B.P. loved her parents and liked when they were at the hospital with her. Velasco testified, however, J.F. failed to engage with L.B.P. during the hospital visits, but conceded she was not present during every interaction between J.F. and L.B.P. Velasco further testified she was concerned about J.F.'s visits with L.B.P. during the hospitalization because of J.F.'s "altered mental state."[21] Velasco was unsure of its cause, but it led J.F. to struggle with balance, alertness, and speaking clearly. She believed J.F.'s behavior would have impacted her care for L.B.P., who she believed would need physical help while recovering. Velasco conceded she did not ask whether J.F. was taking any medication that could have affected her behavior.

Esquivel testified she supervised visits with the children after removal in late October 2022. J.F. initially had visits with the children but had none after April or May 2023. Before that time,

---

[20] L.B.P. and J.J.P. were asked if they wanted to stay with their current caregivers until they turned eighteen years old, and they indicated they did want to stay with them until that time.

[21] Esquivel testified even if the court had elected not to terminate J.F.'s parental rights and grant her possessory conservatorship, he was not comfortable with her visiting the children until he received clearance for the visits from a mental health professional.

J.F. struggled to maintain communication surrounding scheduling visits, and when she did confirm her visit, she would at times not attend.[22] And during three visits J.F. attended, she immediately began crying. L.B.P. grew tired of attending the visits and did not want to see J.F. because J.F. did not always attend. Visitation then became twice a month, but J.F. did not make an effort to attend those visits either. Esquivel also struggled to get J.F. to attend visits because it was difficult to get in touch with J.F. Eventually, the trial court ordered an end to visitation approximately in spring 2023. The other children were also disappointed when J.F. did not attend visits. Esquivel testified he was uncertain when C.B.P. last saw J.F., but he knew they communicated via cell phone.

J.F. testified she did not deliberately miss visits with the children. She testified her missed visits were related to her being sick or because she did not have transportation. J.F. testified L.B.P. broke her arm in the custody of her grandparents. However, she further testified she was grateful her children were with their current caregivers, she wanted them to remain there because they had "a good life" with them, and they better provided for the children than she did while they were in her custody. She simply did not want her rights terminated. She also testified she would continue to maintain contact with the children's father despite the threat of violence; she believed that was the only way to maintain contact with her children because his family had custody of them.

### c. The Present and Future Emotional and Physical Needs of the Children and J.F.'s Parental Abilities

J.F. testified L.B.P. was born with spina bifida. Sendejo testified L.B.P. had to have specific medical treatments, including a urinary catheterization twice a day to relieve her bladder. J.F. testified she was the one who takes care of L.B.P. with her condition, performing the catheterizations for L.B.P. She further testified there were times when L.B.P. was in the hospital

---

[22] She missed one visit because she was hospitalized for "about one day" after a car accident.

for "months and months," and she was the only one there with her. She testified when the school would ask for supplies like diapers and catheters, she would deliver them.[23] If she did not always respond via phone, it was because she had a pay-as-you-go plan and did not always have service. J.F. further testified the heel wound was a recurring issue that had occurred before L.B.P. was hospitalized in the fall 2022 and would recur during the grandparent's care as well. On cross-examination, Velasco testified she had not been aware L.B.P. had had the same type of heel wound while in the Department's care. Esquivel testified C.B.P. and his older brother took care of their younger siblings. The children's adult sister also cared for the younger children. Diaz testified she believed the current caregivers were meeting the physical and emotional needs of the children, and it was in the children's best interest to remain with them.

Esquivel also questioned J.F.'s parental abilities on the basis of her temperament. He testified it was often unpredictable; she was not capable of controlling her emotions. She was not "stable enough" to care for her children, and he believed J.F. suffered from an undiagnosed mental health condition. On occasion, J.F. expressed suicidal ideations. J.F. testified similarly, explaining her children were the reason she was still alive "[b]ecause I think about killing myself all the time."

### d. The Programs Available to Assist J.F. to Promote the Best Interest of the Children

Additionally, the trial court heard testimony showing J.F. did not complete her family service plan, and such evidence is probative of the children's best interest. *See, e.g.*, *In re B.R.T.*, No. 04-22-00416-CV, 2023 WL 29381, at *6 (Tex. App.—San Antonio Jan. 4, 2023, no pet.) (mem. op.). Esquivel testified he created a court-ordered family service plan for J.F. after conducting a family services assessment. Esquivel testified the services were largely within a few

---

[23] Sendejo testified similarly.

blocks of where J.F. lived at the time the plan was created, and he believed J.F. could complete the family service plan. Esquivel then explained the plan to J.F. He also testified J.F. signed the plan and initially agreed to work her plan. He further testified she was aware her parental rights would be terminated if she failed to comply with the plan.

Nearly a year after the children were removed in the fall of 2023, J.F. began engaging in her services, going to Vita Y Salud for parenting classes and individual counseling.[24] She also completed a psychological evaluation. Esquivel testified she only commenced classes and counseling because he reminded her of the then-forthcoming November trial. J.F. attended counseling on and off for approximately two months. During that time, Esquivel recommended the trial court continue the trial date to allow J.F. to work services. According to Esquivel, however, J.F. stopped engaging in services in November 2023 when the children's father was released from jail.[25] She did not contact her counselor again until January 2024. And at that time, J.F. and the children's father were observed staying together. Esquivel testified J.F. did not complete counseling or parenting classes. Esquivel further testified the counselor made an effort to work with J.F. rather than summarily discharge her for failing to attend. Esquivel attempted to take her to counseling, but J.F. simply did not want to perform services and became increasingly hostile to him.

J.F. testified the counselor told her she did a great job and was proud of her. She further testified the "system ha[d] failed [her] and . . . [she] ha[d] failed [her] children." She testified she followed the family service plan and "did a lot more than" the children's father. J.F testified she completed domestic violence counseling, but she agreed she did not complete the parenting

---

[24] The counseling was partially for J.F.'s domestic violence experience as well as to undergo a mental health evaluation.

[25] The children's father was incarcerated for approximately three months for an unspecified crime.

program with the counselor. She further testified she stopped working services because she relocated to Asherton, and they were too far; she admitted she did not contact Esquivel for transportation.

Diaz testified that during the final two months before trial she had made attempts to contact J.F. and secure her current phone number from her oldest son.[26] However, until trial, she had never actually communicated with her. She further testified J.F. never contacted her. She conceded on cross-examination she never emailed J.F. and did not go to her home. She testified J.F. had more than enough time from late October 2022 through May 2024 to have worked her services. Her non-compliance and failure to cooperate in drug testing showed a lack of interest in retaining her parental rights. Diaz testified the Department believed it was in the best interest of the children to terminate J.F.'s parental rights.

### e. Stable Housing and Employment

Esquivel testified the Department was concerned about J.F.'s ability to maintain stable employment. J.F. secured work through an agency as a home health aide. However, she lost her job when her assigned client passed away and then never was assigned another client. Later, in March 2024, she worked in Asherton, Texas picking up scrap metal, earning approximately $200 every two weeks. J.F. testified this salary was enough to survive on her own. Esquivel testified J.F. had not offered to pay for any support of the children. Diaz testified J.F. had no means to support the children. J.F. agreed, but she further explained she left Crystal City for Asherton because she could not find work in Crystal City and was digging in dumpsters.

J.F. did not maintain stable housing. Esquivel testified he attempted to help J.F. secure housing by going to the housing authority in Crystal City and talking to the director. The director

---

[26] J.F. testified she did not know the Department replaced Esquivel with Diaz.

knew J.F. and her family, but could not provide her with a four-bedroom house because it was unclear how long the kids would be with her. Instead, they placed J.F. on the waitlist for a one-bedroom apartment. Esquivel also took J.F. apartment hunting around Crystal City because at that point J.F. had a housing voucher, but there were no apartments available. For a time, J.F. also lived in an abandoned home with no running water or electricity. J.F. eventually secured housing with a friend where she paid rent, but never provided the address to him. Esquivel testified in October 2023, J.F. experienced homelessness, changed cell phone numbers, and did not remain in contact. Esquivel believed the children's best interest was served by remaining in their current placements.[27]

J.F. testified she considered the house in which she lived with the children's father her home for twenty-five years, and she was told to leave "out of nowhere." She testified she could not even take her clothes with her and had to rely on donated clothing and "dumpster diving." She moved to a property owned by her uncle that was an "abandoned home" with no electricity. She testified that at one point she tried to go back to the residence where the family lived prior to removal and where the children's father still lived to secure blankets, but she was arrested for criminal trespassing. When she was living and working in Asherton, she stayed in an RV with a friend, and they split rent. J.F. testified she had planned to move to Corpus Christi with her children at the beginning of the case, but Esquivel persuaded her to remain and improve things there in Crystal City. J.F. also testified she did not secure housing because Esquivel failed to include her on a list for battered women. She further testified she did not provide Esquivel with her address in Asherton because her time staying in the RV was temporary. She also testified she did not purposefully fail to remain in touch with Esquivel; she sometimes had intermittent cell service.

---

[27] Diaz testified similarly.

J.F. testified she was happy her kids were not with her because she would have again experienced homelessness had she not been incarcerated, and the children would "be suffering alon[g] with me, with no place to live and roof over their heads." She further testified she was grateful for the incarceration because she was fed three meals and was allowed to shower every day. She testified she agreed the Department could not return the children to her while she was incarcerated.

### f. Summary

Here, viewing the evidence in a light favorable to the findings of the trial court, we conclude it could have reasonably formed a firm belief or conviction termination of J.F.'s parental rights was in the best interest of her children. *See R.R.A.*, 687 S.W.3d at 276; *J.F.C.*, 96 S.W.3d at 266. Specifically, the trial court could have reasonably formed a firm belief or conviction J.F.'s substance use disorder, domestic violence, and arrests and incarceration posed a physical and emotional danger to the children. *See N.M.R.*, 2022 WL 3640223, at *7; *S.M.G.*, 2017 WL 2806332, at *6; *see also E.D.*, 419 S.W.3d at 620 (providing "trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest"). The trial court could also have reasonably formed a firm belief or conviction the children were well-cared for, they desired to remain with their current caregivers, J.F. wanted them to remain there, and the Department had long-term adoption option plans for them. *See N.J.D.*, 2018 WL 650450, at *6. The trial court could have also reasonably formed a firm belief or conviction that L.B.P.'s long-term developmental challenges, including spina bifida and recurring heel wound were better managed by her current caregivers. The trial court could have also reasonably formed a firm belief or conviction J.F. had multiple opportunities to demonstrate her parental abilities to the Department, show she was best equipped to care for their needs, and work

her family service plan, but she was unable or unwilling to do so. *See id.* In addition, the trial court could have reasonably formed a firm belief or conviction J.F. did not maintain stable employment or housing.

We further conclude any disputed evidence, when viewed considering the entire record, could have been reconciled in favor of the trial court's best-interest finding and was not so significant the trial court could not have reasonably formed a firm belief or conviction termination was in the children's best interest. *See J.F.C.*, 96 S.W.3d at 266. We therefore hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE § 161.001(b)(2).[28]

## CONCLUSION

We affirm the trial court's order.

Luz Elena D. Chapa, Justice

---

[28] J.F. also challenges the trial court's conservatorship determination on the basis that conservatorship should be reconsidered where a trial court's termination order is reversed on appeal. But because this argument requires J.F. to prevail on one of her other two issues, and because we have overruled those issues, we overrule her final issue.